leading off. You have 15 minutes of opening and you preserve five minutes for rebuttal. We will hear from you now. Good morning. Good morning. Thank you. The case that I'm about to present today is about the termination of asylum for my client and as well the denial of his adjustment of the status. I am going to address why the termination of asylum for my client was not proper, and I'm going to do so with three grounds. To begin with, the standard applied to terminate asylum for my client does not conform with the canons of statutory construction. Second, if the standard applied was proper, the evidence does not conform with the substantial evidence does not support the termination of asylum for my client. And third, the VA exceeded its scope of review when issuing its decision. I'm going to start with the statutory canons of interpretation. Mr. Mirza's asylum was terminated because he was deemed to be a danger to the national security. His termination was not proper because it was done using a wrong legal standard. Now, if I may explain the court, both the immigration judge and the Board of Immigration Appeals concluded that my client was a danger to the national security, and they concluded that he may pose a danger to the security. However, the standard required should have been that he actually poses a danger to this national security. The Immigration and Nationality Act provides that aliens are not eligible for asylum or withholding of removal if they are a danger to the security of the United States. These are known as the national security exceptions. There are two different statutes that address these exceptions. Specifically, we have for asylum. Let me ask you, what is the difference between an actual danger and one that is not actual? I mean, all dangers that have not occurred are speculative. Exactly. And that's exactly what we are presenting. And that's our argument is that the statute requires that you have to pose an actual danger rather than to pose a speculative danger to the security. And this comes in the speculative danger or the potential danger, as we have been calling it, comes from a matter of age, which is a decision that the Attorney General issued in 2005, addressing these statutes. The decision the Attorney General requires that the respondent or the alien has to present a danger, oh, I'm sorry, that potentially presents a danger to the security rather than what the statute requires. And that's what we're calling, that doesn't conform with the statutory kind of, the kind of statutory construction that the alien actually poses a danger. Prior to a matter of age, we had a matter of age. I still don't understand what you mean by an actual danger or actually, or poses an actual danger. Yes. So, I mean, yes. Well, a dangerous speculative or actual, I mean, it's always speculative. I just don't understand what the ultimate point, how you arrive at the ultimate point with any kind of logical basis. Right. So if I understand your question, what you're asking me is, I suppose, what's the answer? I'm just saying all dangers, all potential dangers, all dangers that have not occurred and then it's no longer a danger, it's a fact, are potential. All are more speculated in one degree or another. You have on a spectrum of one through 10, you have maybe some that are more likely to occur than others, but an actual danger is always speculative and some essential element of it. Yes, Your Honor. And I think that's a great question. And that's actually what we are trying to address. And if I can draw your attention to the evidence on record in this case. It is what we were calling, my second argument is the substantial evidence of this case doesn't either conform or doesn't either prove that my client presented an actual or a speculative danger. In this case, the standard to... Post a danger though, correct? Well, my argument is that he doesn't pose a danger. I beg your pardon? Your argument is what? That he does not pose a danger, either an actual... He poses no danger. That he poses no danger because there's no evidence that he poses one. Only the evidence that he threatened to kill 50 to 55 people, is that correct? Right. And the evidence is that there were the ramblings of a man who said that he will kill 20 to 50 people or 30 to 50 people. However, a threat by itself is not a threat. It has to be made knowingly and intentionally. This man doesn't know what he's talking about. Okay. Go ahead. Thank you. So I'll continue with the substantial evidence since I started this topic already. The... In addressing the evidence that we have on the record, the evidence doesn't support the fact that he is an actual or that he may pose a danger. The evidence supports the finding that he presents a speculative risk to public safety. And granted, this may not be a person that you want living next door to you, but this is not a person that will actually threaten the national security of the United States. And that's the standard that we had to... Lisa, I mean, if for some reason, he was able to carry out his threat of some 50 to 60 people that he was going to kill, that, in your opinion, poses no danger to the security of the United States. Is that your argument? Well, my argument is that the national security of the United States is defined as whatever it is, the national defense, the foreign relations or the economic interest of the United States. My argument in this case is that what my client said and what happened during his detention did not pose a danger to the national security or poses a speculative danger to the national security. Well, are you saying, although it may be you can concede that he poses a danger to some 55 people or more, he poses no danger to the security of the United States? Is that what you're saying? Yes. What I'm saying is he poses a danger to the public safety. He does not pose a danger to the national security, which is the standard that we need to reach here. How many people would he have to threaten to kill before he would go from public safety to public safety? That's a very good question, George Olman. I don't think it's a matter of threatening so many people. I think with threatening one person that will affect the national defense, the foreign relations or the economic interest of the United States, he will be posing a danger to the national security. And in addition to this, to address the speculative and actual pose a danger, the danger in this case has been defined as a danger that is non-trivial. Non-trivial danger has to be more than a simple threat that law enforcement, that reasonable law enforcement officers decided that he didn't pose any danger. Well, you're saying that even if he killed 55 people that poses no danger to the public safety, to the security of the United States. Now, if there were a bomb that went off in a residential community in a town in Idaho and killed 25,000 people, that would not have been an act that in your view, is that correct? That was a mere matter of public safety. Is that what you're saying? That's what I'm saying, George. As long as we're not talking about national security, which is again, the national defense, the foreign relations or the economic interest of the United States, we don't have somebody who poses a danger to the national security. So if this man had threatened to blow up a federal courthouse, in your view, that is or is not a national security issue? Then I would say that we will have to look if that was to look at whether he made it knowingly and intentionally, whether this threat was made knowingly and intentionally. In the case that we have at hand, my client was detained by the FBI. He was detained by the police department and he was detained by DHS. The three agencies investigated this event. The three agencies concluded that my client was not a danger to the national security. The three agencies determined that he had to be placed in a mental health facility. As of today, even after he's been released, there has not been any investigation as to what happened with him or if he has, he has not been placed in any terrorist watch group. He has not been placed in any terrorist list that would make him a threat or a person of interest for the FBI. I would like to jump back to the standard that should have been used in this case and the controversy that we are presenting is, again, we'll go back to the actual danger, the potential danger that the alien has to represent. In Mariofe H, as I was mentioning before, address 1231, the statute 1231, which is the bar on the withholding of removal as a danger to the national security. And in this case, the attorney general decided that Mariofe H, I'm sorry, that the statute requires a made post standard to the national security. However, the third circuit decided that the standard should not be made post. They decided that the standard should be, is a danger. And therefore that's where we come up with the actual danger. They decided that the use of the term is in context of phrase requires that Congress intended an exception to apply to individuals who actually pose a danger to the security of the United States. Later on, the ninth circuit address this as well. And they've decided that the made post only should not apply. And what they should use is they actually pose a danger to the security of the United States. In addition to this, the fifth circuit had in the past applied the danger to the security of the United States. They interpreted 1231, although it was interpreted in another way. In another situation, the fifth circuit was trying to evaluate if there was reasonable evidence or sufficient evidence to find that the alien is a danger to the security of the United States. However, the fifth circuit in Murtaghi did decide that the alien is a danger. And therefore the standard that they use was that the alien actually poses a danger or has to actually pose a danger to the security of the United States. In addition to these, we are also stating that the BIA committed an error of when they decided that my client was my client asylum should be terminated not only because he was a danger to the national security, but because he was also a member of a terrorist organization. And this was not proper because this was not allowed by the statute. This is not allowed by the law. My client filed for asylum in 1993 and the regulation at the time prohibited the grant of asylum for people who had engaged in terrorist activities. However, the immigration judge decided, I'm sorry, while the immigration judge discounted the fact that he had been a member of a terrorist organization, the court decided or the Board of Immigration Appeal decided that my client's asylum should also have been terminated because he was a member of a terrorist organization. This by statute should have not happened. I'm out of time by now. All right. Well, thank you for your opening, but you've reserved your rebuttal time. So we'll hear now from the department. Is Igo? How do you pronounce it? Yes. Good morning. Alison Igo, representing the Attorney General. There are only two issues properly before the court. One, whether the BIA's interpretation of the statutory phrase was a reasonable interpretation and how the board in this particular case actually implemented that interpretation. And then whether the board exceeded its scope of authority and made a de novo factual finding. I'd like to address the first one. The board was well within its rights to interpret this statutory phrase as used in an immigration statute with which it has authority over. Both the Third and the Ninth Circuits found that the board's interpretation was reasonable and upheld it. The Ninth Circuit in Malkandi and the Third Circuit in Yusupov. They did, however, disagree with the board's interpretation or rather, I would say the standard of proof required, saying that the board erroneously used the may pose a threat rather than is a threat. But in this case, the court does not have to decide that issue because as I pointed out in my briefs, both in my brief, both the immigration judge and the board use the proper standard and found that he presents a danger. Although my opponent has argued that the immigration judge applied the wrong standard, it's very obvious from the language that the immigration judge and the board used. You can look at the immigration judge's decision on the administrative record, page 58 to 59, and then the board's decision on the administrative record, page three, that they said that the respondent presented a danger to the security of the United States. I would also argue that there's more than sufficient evidence in this case to show that he presented a danger. His own brother actually was the person who called the tip line in this case when he called his mother and said that he was going to kill 30 to 50 non-believers and that they should watch the news and to see that there would be something big happening in Amarillo, Texas. He was taken into custody and placed under a psychiatric watch. And although my opponent argues that it's the ramblings of somebody who is mentally incompetent, I would argue that that makes him almost more dangerous because he's not subject to reason. He's hearing voices. He's having suggestions that he should go out and kill people. And that is not a mitigation to the danger that he poses. His own family, both his brother Amir Reza and his brother-in-law and sister, who later came in and were present at his questioning, said that he poses a danger. He is subject to influence that if he were to get a weapon, he could possibly, that he would use it. They also outlined an incident that he had with the Western Union where he went back in anger and threatened people, threatened to kill the agent there who refused to give him money. There's more than enough evidence in this record to show that he is a danger to the security of the United States. My opponent also argues that, you know, argues about the definition of the security of the United States. It's not just national security. The definition in this case in matter of age, the board said, said security of the United States encompasses foreign relations, national defense, and the economic interests of the United States. I would argue that, I mean, the immigration judge, and I believe found, and I believe my opponent concedes that he was clearly a danger to public safety, at least. And I would argue that being a danger to public safety, certainly if he were to kill as a foreign national in this country, and also with the motivation being to somehow revenge himself on non-believers, that that would certainly affect, and the immigration judge found, foreign relations with a country with which we have diplomatic relations at the moment. It's also 30, killing 30 to 50 people, and as a foreign national, again, would certainly affect the economic interests of the United States. The immigration judge found that, and I think the court has recognized that. I mean, that, it seems like to me, that's stretching it a bit to say that 30 people die in, you know, a town in Texas affects the economic interests of the country. I mean, that's... Well, I think that you, it's not just a question of 30 people. This isn't a question of an American citizen engaging in a crime spree. This is a question of a foreign national, and in this case, a Muslim. We have seen in the past that, you know, the implications of that, we've had a Muslim ban in the United States. We had a tremendous backlash in the country after the 9-11, and you have to look at all of those things in context. I mean, how does this really affect the security of the United States? Do you have any case that would support such tangential or such remote effect on security as would qualify as a security interest? Well, the security of the United States encompasses, as the board defined it, to include foreign relations, and certainly foreign relations with a number of, you know, our Muslim-dominated countries was very negatively affected after 9-11 when there was a disaster perpetrated by religious Muslims, and I would argue... Which you would include, say, if this individual killed several people in the name of his religion, and he would try, that would create, could possibly create an international issue with respect to Muslims and as it relates to terrorism. As it relates to our relations with, yes, Muslim-dominated countries. So it's not just, it's not his threat that causes security, I think, that endangers security. It's the fact that if he has tried, if he does it and he's tried, and it becomes publicized, then national security interests or foreign interests may be affected. Is that your argument? Yes, that is my argument, and certainly... In other words, you would have to take it far beyond where it is now. A mere threat to kill 55 people doesn't seem to me plausible to say that it affects international relations or the security interests of the United States. If he actually did it, then that takes it one step. If he's tried for it and it becomes publicized, that's another step. So you're rather removed, it seems to me, from actually demonstrating. But as you pointed out earlier, Your Honor, anything that has not yet, any act that has not yet been completed is certainly in the threat stage. So you can't wait for him to kill 30 to 50 people in order to then consider him to be a danger to the security of the United States. I mean, his threat alone. And I would add that it wasn't, I mean, this isn't just some, you know, something that no one thought, although my opponent argues that, you know, no one really took this seriously. His brother and his brother-in-law and sister took this seriously, and in fact, interacted with law enforcement because they were concerned about... We wouldn't say you're displeased. I mean, it takes into account the fact that he may do it and that it may have all the applications that I've already alluded to. Yes. And in fact, it wasn't just his threat to kill 30 to 50 people. His threat was to kill non-believers. And he said that he would be rewarded by Allah. You know, clearly he was tagging this to his Muslim faith. It wasn't just a question of somebody engaging in a criminal act. This was religiously motivated clearly by him, you know, in the statement that he made, and he admitted to making that statement. And also, I think you have to look at the fact that he's had a longstanding, you know, 30-year association with an organization that this country has designated as a foreign terrorist organization. And combined with those two things, certainly, if he were to carry this out, that would certainly negatively affect our relations with the countries that... In Pakistan, the MQM is a major political party in that country. Yeah, but it seems that your argument carries you into the area of posing only a speculative at this stage, a speculative danger to security at this stage. Well, I would argue that it's the weight of the evidence. You know, somebody can be walking down the street and say, you know, I think maybe I will kill 30 to 50 people. In this case, this was a very targeted threat. It was made to his family members who are also supporters of MQM. It was significant and more than just speculative in the sense that his brother was the one who called the Crimestoppers. He took it seriously. And I think that you cannot wait until somebody actually carries out this threat. Well, you're saying that a proper interpretation of this language includes speculative dangers as well as dangers that are more likely to occur than... Well, I think the use of the word speculative is a little bit loaded. I think when you look at... Well, okay, use your term. What would you say? Well, I would say a threat, which is more than speculative because in the immigration context, we allow people to argue and be granted asylum when they have been threatened with death or threatened with bodily harm in another country. And we accept that as evidence of persecution, even though it has not been carried out. When people get threatening letters, you know, arguing that they will be killed because of their religious beliefs or because of their ethnicity, we allow them to prove a case for asylum. We don't wait until they are killed. We don't wait until they are necessarily harmed, although harm is another aspect of an asylum case. We accept threats, and those are not necessarily speculative. Speculative, I think, goes into a whole other area. Carmen, you believe that... Maybe... Well, just a minute. I mean, you believe that asylum can be withheld or withdrawn from someone who engages in the most remote sort of speculative threat to the security of the United States, even though he has no ability to carry it out? No, I'm not arguing that. I am arguing that in this case, it was not speculative. His brother, his family members... I mean, aside from this case, though, what are you arguing satisfies the statute of a danger? That the evidence taken as a whole, I would not argue outside the confines of this case, because the court... I mean, as the court knows, it doesn't have any authority to consider a question that is not specifically before it. But in this case, I mean, the board has said that he has to pose or present a danger to the security of the United States. And then you look at the evidence that is presented in the particular case and determine whether that presents is substantial evidence to meet that standard. In this case, I am arguing that... To meet what standard? To meet what standard? The standard of whether he poses a danger to the security of the United States. That is the statutory standard that the court is looking at. That's the statute that Congress put into the statute. The standard is that he poses any danger to the United States. Is that what you said? Any danger to the security of the United States. Yes, any non-trivial. And in fact, both the Third and the Ninth Circuit looked at what a danger is, and they both said that it is any non-trivial danger. It's not a speculative danger. It is any non-trivial danger. And I would argue that in this case, the evidence more than supports that this is more than a non-trivial danger. You have somebody who is mentally impaired, who is open to suggestion, who has been... Pardon me. His family members said would be open to suggestion to somebody who would use him to carry out a plot, that if he got a weapon, he would definitely be a danger. And that's the at least a non-trivial danger to the security of the United States. So I would say no, and not a speculative danger. I don't believe that that would meet the standard. But I think that both the Third and the Ninth Circuits have been clear in saying that any non-trivial danger. And I think that when you have some... Can a speculative danger be non-trivial? Well, I would say no, but it depends on how you are saying speculative. As you said earlier, any threat that has not been carried out, I wouldn't say that any threat is speculative. It looks at the person's ability to carry out that threat. If I say, I'm going to go out and kill somebody, but I don't have the means or the possibility of doing it, then that is a case... Is that not the argument that they are making here though? Yes, they are making. This individual had no ability to carry out the death and he was crazy. I would argue that his mental health is an exacerbating factor in this case. You can't say that just because somebody is mentally ill, that they do not pose a threat. I would say his and suggestion by other forces, forces that pose a real threat to the United States. And the board found that his association with the MQM, which the United States considers to be a terrorist organization, and that could possibly be that persuasive factor. And if somebody gave him a weapon, that he would pose an actual danger. That's what his family members said. So I would say that in this case, the evidence moves far beyond speculation. You get it back into actual dangers. But that's what the court found in this case, rather the board found in this case, that he presents a danger. The board did find... argues that may pose is not a proper standard. I would say, I'm not arguing that. I'm just saying that that is not before the court in this case, because the board found that he presented an actual danger in both the IJ, immigration judge and the board found in plain language that he presents a danger. And that is not a threat that or speculative that is. And then the issue is whether the court believes that the evidence supports that finding that he is an actual danger to the security of those things. His mental illness adds to that, his threat, his family coming in and explaining that he's open to persuasion, that he has this connection to a terrorist organization that have given a weapon and his prior threat to harm a Western Union employee. Those are all evidence that this is not speculative, but that he actually poses a danger. He, you know, the evidence in the record shows that he refuses treatment. He's living on the street. Just state again, you've been asked this before, but just so it's clear. The BIA finding expressly states that the disposition was not based on his membership with MQM, but because he was found to pose a danger to the security of the United States. So taking you back to a question Judge Jolly asked you way at the beginning, and we hear your answer is that the family deemed him a threat. So, you know, they called a tip line. Well, that could be threat to public safety. So just articulate for us. We understand what the bounds of our disposition is not making some natural pronouncement, but the language is that he posed a danger to the security of the United States. So just restate your answer to the question Judge Jolly asked. It's agreed he potentially has a danger and it's understood he's got this mental situation, but it's to the security of the United States that's the hang up. So restate or articulate in answer to the question Judge Jolly asked, what is the articulation of the danger to the security of the United States, as opposed to obviously a danger to his locale and so forth? Well, the board found that he presented a danger because of his threat to kill 30 to 50 non-Muslims, coupled with the evidence of his association with a terrorist organization. That's what the board found. It's not just that his, I mean, I'm arguing that his family coming in and tipping off shows that they considered him to be a danger, but the board found that he was coupled with- No, no, no. I'm not asking you that. I'm not asking you that. Answer the question I'm asking you, not the one that you want to ask. I'm trying to answer it. All right. Just listen first before you start answering. All right. We heard you in terms of who made the tip line. We heard you in terms of what you said about substantial evidence. I am only circling you back to a question Judge Jolly asked you earlier, and that is connecting all of that to the, quote, danger to the security of the United States, close quote. In the BIA ruling, it says, however, as discussed above, the respondent's asylum status has not been terminated based on his membership with the MQM, but rather because he was found to have posed a danger to the security of the United States, close quote. And all I'm asking you is to rearticulate what constitutes the danger to the security of the United States within the meaning of the words of the statute on this record. The fact that the board found that it was not terminating his asylum because of his membership in the MQM did not preclude it from considering the fact that he is a danger to the security of the United States, which is defined as national defense, foreign relations, and economic interests, that it didn't preclude it from considering the fact that he made these threats to non-Muslims, and he has this long-term association with a group that's considered a terrorist organization by the United States. So the board could consider his danger because of his threat of terminating his asylum based on his membership in that organization. And my time... Well, I'm just, I'm just gonna, with no disrespect, counsel, but I'm gonna assume you're unable to answer my question, as opposed to refusing to answer it, because your answer is good, but it's not what I asked you. You're just going back restating, you know, what's in the record, and that wasn't what I asked you, and I know you're not refusing to answer me, but I just asked you to drill down into the pose the danger to the United States part. That was something Judge Charlie asked you way back when. That's all I was asking, not a trick question. Well, I, pardon me, Your Honor, I thought I was answering it. His association with this group that's considered to be a terrorist organization that is also a major political party in Pakistan, if he were to carry out this, this action, you know, in association with his, you know, with the MQM, I am arguing that that would damage foreign, I mean, and it's what the board found, that it would have a negative effect on foreign relations, on our relations with Pakistan. We're talking about a political party in Pakistan that's considered to He has a long-term association with that, and the board found that his association coupled with his threat was the danger, and I am arguing that it is that association that connects it to the definition of security of the United States, which is defined as foreign relations. All right. I hope that answered your question. I wasn't trying to evade your question. I thought you were not. In these cases, more so than we are, and we richly appreciate it. Oh, I never assumed that you were trying to evade the question. It's, it's tricky. It's just the language that we're bound to hew to, and it's the security to the United States piece is why we've asked you a lot of questions about that. But no, your answers are helpful, and, and your time is up, and I fully appreciate the answer to my question. Are there any other questions, Judge Jolly or Judge Oldham, you have from Miss Igoe before she leaves? All right. Thank you, ma'am. Thank you so much. All right. We're back to you, Miss Obando, for rebuttal. You represented Mr. Merzer throughout the proceeding. Yes, sir. You know what you're up against in terms of they did find a danger to the United States, and as Miss Igoe argues, while they said the termination was not based solely on his membership with MQM, it is a fact that he never terminated that membership with them. So why isn't it plausible for the BIA or DIJ to say he, he hasn't terminated, he concedes what MQM was, why isn't the record plausible for the agency to put those things together and say that's enough for posing an actual danger within the meaning of the statute? Yes, there's two answers to, there's two answers to that question. And one is the only evidence that we have of his membership was that in 1993, he filed an asylum application stating that he had been a supporter of the MQM. And the second answer, after that, there's no more evidence of his involvement with the MQM. He's been in the United States. But in the proceeding, in the proceedings below, you represent him. Did you avert to the IJ or anywhere there that he had disassociated himself from MQM or? No, your honor, I did not. As I stated before, he does have mental issues, and it's sometimes very difficult to communicate with him. So it's very difficult to say what he's saying is that it's really true or not. Now, there's two things to that. One is membership and support are not the same. And the standard for this case in when they deny the adjustment of status should have been membership, not support. What my client stated throughout his case is that he was a supporter. Now, if the board or if the IJ would have used the word support to deny his adjustment, there were certain requirements as well for support to be meaningful under the law. Just stating I support an organization doesn't make me a member of the organization or doesn't make me take steps towards fulfilling the mission of this organization. But your hurdle is the that's not our task. But you had a full-blown proceeding before the IJ, the BIA, you represented him there. I'm sure you gave him able representation. So your standards, so how do you meet that? And for me, the answer is the government didn't meet the standard, the burden of proof. The initial burden of proof was they had to show that there was evidence enough to support the fact or the finding that my client was a danger to the security and was a member of a terrorist organization. The only evidence that we have for this is the old information about his membership or his support to the MQM and the ramblings that he constantly pronounced during the hearing, even after accepting to take the fifth or to please the fifth. He stated that he was doing so in support of the MQM, which makes absolutely no sense. In addition to this, there's zero evidence that he ever took a step towards harming anyone or that he ever made a plan of any mass murder. There's no evidence of violence in the past or that he's likely to become violent. Again, I would draw the attention to the court to the evidence of the testimony of the officers where after he was detained, all type of investigation was stopped. The only investigation that was conducted was whether he had violated his immigration status or not. He wasn't placed in a terrorist watch. He wasn't placed in, there was no charges pending against him. As of now, again, he has been released from detention and he's living out well on the streets of Dallas. I will conclude my argument saying that the BIA decision should be remanded back to them to apply the correct legal standards regarding the termination of asylum for my clients. My client is not a danger to the security. The standard that the BIA use while the government is arguing that they use the actual standard, the BIA does cite to matter of age where they use the May post standard. If you read the decisions of the immigration court, the immigration court actually goes through a speculative risk analysis to conclude that he poses a danger. For these reasons, thank you. No, finish your statement. Go ahead and finish it. Thank you. For these reasons, the case should be remanded and this decision cannot be sustained by the court. All right. Thank you, Ms. Ovando. Thank you, Ms. Igo. Please don't interpret anything I said other than noting you're able to advocate and doing what you do. I appreciate your expertise, both of you, in helping us out with these cases. The case will be submitted on the brief. Your argument is very helpful to us and we'll get it decided as soon as we can. Thank you and you may be excused. Thank you. Thank you.